United States District Court
Southern District of Texas

**ENTERED**

August 09, 2016

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MUHAMMAD AMAN NOMANI, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-03422 |
| | § | |
| STAR FURNITURE COMPANY | § | |
| | § | |
| Defendant. | § | |

## OPINION & ORDER

Pending in the above-referenced employment discrimination action is Defendant Star Furniture Company's (Star) Motion for Complete Summary Judgment. (Doc. 21.) Having considered the motion, Plaintiff's First Amended Response and Opposition to Defendant's Motion for Complete Summary Judgment (Doc. 25), Defendant's Reply in Support of its Motion for Summary Judgment (Doc. 26), the record, and relevant law, the Court is of the opinion that Defendant's motion should be granted for the reasons set forth below.

### I. Background

On January 19, 2005, Plaintiff Aman Nomani ("Nomani"), a 59-year-old Pakistani American of the Muslim faith, began his employment with Defendant Star Furniture Company ("Star"). (Doc. 9 at ¶¶ 13–14, 16.) The store where Nomani was originally assigned, known as Store No. 6, was managed by Bill Barnum ("Barnum"). (*Id.* at ¶ 17.) Although Nomani began as a "Sales Consultant," he eventually became a top-seller, entitling him to membership in Star Furniture's President's Club—a designation reserved for associates selling in excess of $1.1 million in inventory in a year. (*Id.* at ¶¶ 16, 19–20.)

In spite of his high sales, Nomani alleges that Barnum discriminated against him in a number of ways during his five years at Store No. 6. The first such incident occurred after

Nomani was instructed to cease his daily prayers[1] in the break room and Barnum directed him to "an electric room full of rat droppings and spider webs" where he could pray during work hours instead. (*Id.* at ¶ 23.) Three weeks later, Nomani's prayer mat was stolen. (*Id.* at ¶ 24.) When he complained to Barnum about the theft, Barnum stated that he could not do anything about it, but the mat reappeared a month later. (*Id.*)

As a devout Muslim, Nomani also observes halal status.[2] (*See id.* at ¶ 25.) Although Star occasionally served its employees lunch, until Nomani advised Barnum what he could and could not eat, because of his dietary restrictions, these lunches generally contained nothing permitted by his faith. (Doc. 21 at 13.) Even after advising Barnum and the office manager of his dietary needs, however, at times, the lunch would still not contain anything halal. (*Id.*)

According to Nomani, Barnum "continually criticized" him for his observance of prayer and halal status. (Doc. 9 at ¶ 25.) On numerous occasions Barnum also called Nomani a terrorist from a third-world country, threatened to have him deported, and made fun of his ethnicity, religion, and values.[3] (*Id.* at ¶ 26.) Barnum also allegedly singled out Nomani, treating him differently than other employees—including by refusing to pay, or forcing him to split, commissions Nomani had earned. (*Id.* at ¶¶ 27–29.) In one incident that Nomani cites to show

---

[1] As a follower of the Muslim faith, Nomani observes five daily prayer times: (1) Fajr (predawn); (2) Dhuhr (afternoon); (3) Asr (evening); (4) Maghrib (sunset); and 5) 'Isha (evening). (Doc. 9 at ¶ 21.) Some of these prayer times fell during his scheduled shifts at Star. (*Id.* at ¶ 22.)

[2] The term "halal" is used in reference to foods and drinks that are permissible for Muslims to eat or drink under Islamic law. *See* "Halal" definition, Wikipedia, https://en.wikipedia.org/wiki/Halal (last visited May 5, 2016).

[3] Although Barnum denies that he ever called Nomani names or made fun of him (Docs. 21-8 at ¶ 35; 24-2 at p. 57, lines 5–6), he concedes that he once joked with Nomani that he was going to call immigration after Nomani made a mistake and asked Barnum, in jest, whether Barnum was going to fire him. (Docs. 21-8 at ¶ 36; 24-2 at p. 54, line 22 – p. 55, line 23.) Barnum claims that he responded to this question with something along the lines of: "I will tell you like I tell my wife (who was born in Mexico); I will call immigration on you." (Docs. 21-8 at ¶ 36; 24-2 at p. 55, lines 18–23.) According to Barnum, both he and Nomani laughed during this exchange. (Doc. 21-8 at ¶ 36.)

inequitable treatment, Nomani and a co-worker, Jerry Singer, were at the front of the store in the number-one and number-two "greeter" positions when another co-worker, Toto Dong, violated company policy by greeting the next customer to walk in. (*Id.* at ¶ 30.) After Nomani pointed out Dong's violation to her, Dong reported the incident to Barnum, who demanded that Nomani apologize to Dong. (*Id.* at ¶ 31.) When Nomani refused to do so because it was Dong, not he, who had violated company policy, Barnum allegedly became furious.[4] (*Id.* at ¶¶ 32–33.)

Soon after the Dong incident, Nomani sought to transfer stores. (*Id.* at ¶ 34.) Accordingly, he emailed his request to Star's Regional Manager, Terry Patrick ("Patrick"), and Human Resources Director, Rick Hodge ("Hodge"). (Docs. 21-7 at ¶ 12; 21-10 at ¶ 9.) Nomani claims that this transfer request was due to Barnum's discriminatory behavior, and that in spite of his complaints about Barnum's behavior to Patrick and Star's President, Bill Ward ("Ward"), nothing was done to investigate the situation.[5] (Doc. 9 at ¶¶ 36–37.)

Nomani's request was ultimately approved and he transferred to Robert Taylor's ("Taylor") store, Store No. 4, on April 21, 2010. (Doc. 9 at ¶¶ 18, 38.) Nomani continued to work for Star for two more years under Taylor's management. (*See* Doc. 9 at ¶¶ 18, 39.) Nomani alleges that despite the management change the discrimination continued.  On November 14, 2011, Taylor sent Barnum an email entitled "the big mo," referring to Nomani, to which Barnum replied: "One of these days mo will be no mo."[6] (Doc. 24-10.) Additionally, in an email between

---

[4] Not surprisingly, Barnum relates a different version of events. He alleges that Dong told him that Nomani yelled at her on the floor in an "outburst," which upset her so much that when she approached Barnum to report the incident she was crying. (Doc. 21-8 at 28–29.) Barnum maintains that he could have disciplined Nomani for this incident but chose not to. (*Id.*)

[5] Patrick, Hodge, Barnum, and Ward all dispute that Nomani's transfer request was premised on discrimination or that, if it was, he ever complained about the purported discrimination to anyone. (Docs. 21-6 at ¶¶ 17–19; 21-7 at ¶¶ 11–13; 21-8 at ¶ 34; 21-9 at ¶ 27.)

[6] Both Barnum and Taylor dispute that the comments in this email were discriminatory. Barnum asserts that his reply simply meant that if Nomani continued to violate store policies he would

Patrick and Taylor during this time, Taylor stated: "They all need help with the exception of Muhammad, and I love pointing out the free lunch to him during Ramadan."[7] (*See* Doc. 69 at p. 69, line 22 – p. 70, line 4.)

On April 30, 2012, Nomani's employment was terminated. At the time of the termination his employment file contained a number of disciplinary write-ups and warnings.[8] The first is a "Disciplinary Report" dated October 23, 2006, and issued by Barnum, which states he discussed two violations of company policy with Nomani: (1) selling merchandise for an unauthorized price, and (2) failing to follow company selling, operational, and office procedures. (Doc. 24-1 at 524.) The bottom of this notice reads: "Failure to improve areas of deficiency or failure to conform to any company standard as outlined above may result in further corrective action up to and including termination of employment." (*Id.*) Nomani signed the notice indicating he had read and understood its contents. (*Id.*) The second was a "Courtesy Reminder" issued on January 8, 2010, indicating that Nomani's performance was deficient for "arbitrarily set[ting] delivery dates." (Doc. 24-1 at 530.) Again, Nomani signed and dated the document, indicating that he read and understood it. (*Id.*)

The third document, issued by Taylor and titled "Disciplinary Notice," indicates that on July 7, 2011, Nomani was again disciplined for (1) selling merchandise for an unauthorized

---

eventually be terminated, while Taylor states that he does not remember choosing the title "the big mo," and his original message was simply relating to the other managers that he had refused Nomani's request for time off during a period in which Star does not grant anyone requested time off. (Docs. 21-8 at ¶ 32; 24-3 at p. 71, line 12 – p. 75, line 4.)

[7] Like Barnum, Taylor disputes that this comment was made in anything other than a jesting manner. (Doc. 24-3 at p. 69, line 22 – p. 71, line 3.)

[8] In addition to these formal disciplinary write-ups and warnings, an email between Taylor and Patrick dated November 8, 2011 (Doc. 21-9 at 21) and a statement from Taylor that Nomani engaged in a "shouting match" with a coworker named Nursel Morgan in June 2011 (Doc. 21-9 at ¶ 19) indicates that Nomani likely engaged in at least two other undisciplined violations of Star policies.

price, and (2) failing to follow company selling, operational, and office procedures. (Doc. 24-1 at

532.) This notice also references a third violation of company policy: Nomani's referral of

business to a competitor. (*Id.*) The bottom of this notice clearly states:

> On August 04, 2010, you were counseled on the Requirement for Sales
> Associates, with regards to proper requirements on several sales and discount
> areas when selling for Star Furniture.
>
> Your continued violation of our policies, procedures, and requirements is
> considered gross misconduct and will not be tolerated and puts your job in serious
> jeopardy.
>
> This is your final warning. Should you violate any policies, procedures, or selling
> requirements, you will be <u>terminated</u>.

(*Id.*) (emphasis in original). This notice was also signed by Nomani. (*Id.* at 533.) On November

16, 2011, Nomani received his fourth disciplinary document when he was again issued a

disciplinary report, this time indicating that he had given out an unauthorized discount under the

"Friends and Family" program. (Doc. 24-1 at 534.) This report contains the same language from

the 2006 disciplinary report, stating that failure to improve could result in further disciplinary

action, including termination. (*Id.*) Nomani signed the document. (*Id.*)

Less than a month later, Nomani received yet another courtesy reminder, his fifth write-

up or warning, for having an "outburst[]" at another coworker at the front greeting area of the

store.[9] (Doc. 24-1 at 535.) Again, Nomani signed the notice, indicating he read and understood

its contents. (*Id.*) Finally, on April 30, 2012, Nomani received his sixth and final document, a

final disciplinary notice indicating that his employment was being terminated. (Doc. 24-1 at

536.) This final notice states that he violated Star policies in the following areas: (1) "altering,

forging, or falsifying any company document or record," and (2) "insubordination or refusal to

---

[9] This is not Dong from the 2010 incident, but the same coworker from the uncited June 2011
altercation, Nursel Morgan. *See supra* note 8.

fully follow the instructions of a supervisor or any member of management." (*Id.*) The notice contained a list of prior disciplinary actions taken against Nomani, including the November 16, 2011 and July 11, 2011 actions and states that "[d]ue to your continued disregard and violations of Star Furniture's policies and procedures we are terminating your employment." (*Id.*) Nomani refused to sign this notice. (*See id.*)

On February 14, 2013, Nomani filed a charge of race, color, religion, and national origin discrimination, and of retaliation, against Star with the Equal Employment Opportunity Commission ("EEOC") and Texas Workforce Commission, Civil Rights Division ("TWC"). (Docs. 9 at ¶ 9; 24-1 at 497.) The EEOC issued Nomani a Notice of Right to Sue Letter on October 29, 2013. (Docs. 9 at ¶ 10; 21-7 at 17.) Nomani then initiated this suit within the statutory ninety-day filing window by filing his Original Complaint on November 19, 2013. (Doc. 1.) Nomani filed a First Amended Complaint on December 10, 2013 (Doc. 7) and a Second Amended Complaint on December 14, 2013 (Doc. 9). On March 6, 2015, Star filed its Motion for Summary Judgment (Doc. 21), which is now ripe for adjudication.

## II. Legal Standard

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewed in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1996). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.* at 248.

The movant initially bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact on which the nonmovant bears the burden of proof at trial. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 885 (1990) (citations omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. When the moving party makes an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact concerning every element of its cause of action in order to defeat the motion for summary judgment. *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998); *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994); *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). There is no genuine issue for trial if a rational trier could not find for the nonmoving party based on the evidence presented. *City Pub. Serv. Bd.*, 40 F.3d at 712–13 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584–88 (1986)).

Allegations in a plaintiff's complaint are not evidence. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (internal citation and quotation marks omitted) ("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1995) (quoting *Solo Serve Corp. v. Westtown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991) (for the party opposing the motion for summary judgment, " 'only evidence—not argument, not facts in the complaint—will satisfy' the burden."). Likewise, unsubstantiated assertions, conclusory allegations, improbable inferences, and unsupported speculation are not competent summary

judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). Instead, the nonmovant must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001) (quoting *Celotex*, 477 U.S. at 324) (internal quotation marks omitted).

In ruling on a summary judgment motion, the court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant, but the court may not make credibility determinations or weigh the evidence. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### III. Analysis

#### A. Plaintiff's Discrimination Claims

Count One of Nomani's complaint alleges that Star discriminated against him in violation of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e–2000e17, because of his race (Asian), color (brown), national origin (Pakistani), and religion (Islam) "by tolerating and failing to take affirmative action to correct . . . unlawful employment practices, by discriminating against Plaintiff with respect to terms, conditions and privileges of his employment because of his race, color, national origin and religion, through denial of his employment rights and benefits, promotions and achievement, and by terminating his employment . . . ." (Docs. 9 at ¶¶ 40–48; 25 at 8.) Count Two makes the same allegations on the basis of race in violation of § 1981. (Doc. 9 at ¶¶ 49–53.) In support of these allegations, Nomani alleges that when he was still at Store No. 6, he was forced to pray in "an electric room full of rat droppings and spider webs," had his prayer mat taken away, was repeatedly criticized for praying

and not partaking of the non-halal food Star served to its employees, endured comments from Barnum that he was a terrorist and Barnum was going to have him deported, had to share or give up commissions he had earned for no reason, was singled out unfairly in his work requirements, was treated differently than other sales consultants, and received no response to his complaints about Barnum's discriminatory behavior. (*Id.* at ¶¶ 23–39.)

### i.   Title VII & Section 1981 Legal Standard[10]

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Under the statute, suit may be brought under two distinct theories of discrimination, disparate treatment and disparate impact. *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Title VII expressly prohibits both (1) intentional discrimination based on race, color, religion, sex, or national origin, known as "disparate treatment," as well as (2) an employer's facially neutral practices that are discriminatory in operation against protected groups (race, color, religion, sex, or national origin) and not required by the nature of the job, known as "disparate impact." *Id.*; 42 U.S.C. §§ 2000e–2(a)(1) and 2000e(k)(1)(A); *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009); *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006). Disparate-

---

[10] Because Title VII and section 1981 require the same proof to establish liability, the summary judgment analysis is the same and Plaintiff's claims under both statutes will be considered together. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (citation omitted); *see also Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 n.7 (5th Cir. 2004) (citations omitted) ("[R]ace discrimination claims brought pursuant to section 1981 are governed by the same evidentiary framework applicable to employment discrimination claims under Title VII."); *Bunch v. Bullard*, 795 F.2d 384, 387 n.1 (5th Cir. 1986) (citation omitted) (noting that separate consideration is not given to §§ 1981 and 1983 claims parallel with Title VII).

treatment cases such as this[11] require proof of discriminatory motive while disparate-impact cases do not. *Pacheco*, 448 F.3d at 787.

Before filing suit, a plaintiff bringing claims under Title VII must exhaust administrative remedies by filing a charge of discrimination with the EEOC within the statutory period and serve notice upon the person against whom the charge is made. 42 U.S.C. § 2000e–5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). Because Texas has an agency for receipt of civil rights complaints, i.e., the TWC, it is known as a "deferral state," which means that an individual who initially files a grievance with the TWC has 300 days from the unlawful employment practice in which to file his complaint with the EEOC. 42 U.S.C. § 2000e–5(e)(1); *Huckabay v. Moore*, 142 F.3d 233, 238 (5th Cir. 1998). Failure to file a timely charge with the EEOC, which allows the agency to investigate and, if appropriate, negotiate a resolution with the employer, bars suit in federal court. *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008).

Unlawful discrimination under Title VII can be established through either direct or circumstantial evidence. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). "Direct evidence proves intentional discrimination without inference or presumption when believed by the trier of fact." *Jones v. Overnite Transp. Co.*, 212 Fed. App'x 268, 272 (5th Cir. 2006) (per curiam) (unpublished) (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)). "[D]irect evidence includes any statement or document which shows on its face

---

[11] Although Count One of Nomani's complaint cites the entirety of Title VII as the basis of his claims, the Court finds that the facts alleged support none of the elements of disparate impact. "A disparate-impact plaintiff must show (1) a facially neutral policy; (2) that, in fact, has a disproportionately adverse effect on a protected class." *Pacheco v. Mineta*, 448 F.3d 783, 791 (5th Cir. 2006) (citation omitted). Because Nomani's complaint only supports claims for unfair and intentional discrimination, the Court will analyze his discrimination claims under a disparate-treatment theory.

that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003), *overruled on other grounds by Smith v. Xerox Corp.*, 602 F.3d 320, 330 (5th Cir. 2010)).

In contrast, in circumstantial cases such as this, courts apply the well-known *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Allen v. Radio One of Tex. II, L.L.C.*, 515 Fed. App'x 295, 299 (5th Cir. 2013) (per curiam) (unpublished). Under this framework, a plaintiff carries the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. A plaintiff's subjective belief that he was discriminated against is insufficient to establish a prima facie case. *Vasquez v. Nueces Cnty.*, 551 Fed. App'x 91, 94, No. 13–40453, 2013 WL 6670973, at *2 (5th Cir. Dec. 19, 2013) (per curiam) (unpublished) (citing *Baltazor v. Holmes*, 162 F.3d 368, 377 n.11 (5th Cir. 1998)). Rather, to make out his prima facie case, a plaintiff must show that (1) he is a member of a protected group, (2) he was qualified for his position, (3) he was discharged or suffered some other adverse employment action, and (4) he was replaced with a person outside of the protected class, or he was treated less favorably than similarly situated employees of a different race. *Jones*, 212 Fed. App'x at 273 (citing *McDonnell Douglas*, 411 U.S. at 802; *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001)). With regard to the third element, "adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (internal citation and quotation marks omitted). Moreover, when the employer does not replace the plaintiff, he need only show that others who are not in the protected class remain in similar positions in order to satisfy the fourth element. *Vasquez v. El Paso Cnty. Cmty. Coll. Dist.*, 177 Fed. App'x 422, 424 (5th Cir. 2006) (per curiam)

(unpublished) (citing *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999)).

Once the plaintiff establishes a prima facie case, a presumption of discrimination arises and the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the employment action at issue. *McDonnell Douglas*, 411 U.S. at 802. If the defendant meets this burden of production, the presumption of discrimination created by the plaintiff's prima facie case disappears and the plaintiff must meet its ultimate burden of persuasion on the issue of intentional discrimination. *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citation omitted). A plaintiff may meet this burden by producing evidence either that the defendant's proffered nondiscriminatory reasons are not true, but instead a pretext for discrimination or, if true, the plaintiff's protected characteristic was, nevertheless, a motivating factor for the adverse employment action. *Id.*

Showing that the proffered reasons for the challenged employment decision are false or unworthy of credence demonstrates pretext. *Laxton v. Gap Inc.*, 33 F.3d 572, 578 (5th Cir. 2003) (internal citations omitted). Any evidence that demonstrates that the employer's proffered reason is false may show pretext. *See Reeves*, 530 U.S. at 147 ("[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (alteration in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)) (internal quotation marks omitted). For example, "[w]hen an employer offers inconsistent explanations for its employment decision at different times . . . the jury may infer that the employer's proffered reasons are pretextual." *Staten v. New Palace Casino, L.L.C.*, 187 Fed. App'x 350, 359 (5th Cir. 2006) (citations omitted). "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S.

at 148. However, as the Supreme Court has cautioned, such a showing will not always be sufficient to sustain a finding on discrimination, such as when "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 148 (citations omitted).

In a mixed-motive case, if the plaintiff demonstrates that a protected characteristic was a motivating factor in the employment decision, the defendant must then prove that the same adverse employment decision would have been made regardless of discriminatory animus. *Rachid*, 376 F.3d at 309–10 (citations omitted). Importantly, although the evidentiary burdens shift back and forth under *McDonnell Douglas*, the plaintiff carries the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated against him. *Reeves*, 530 U.S. at 143.

### i.   Timeliness of Claims

Star first attacks Nomani's discrimination claims to the extent that they are based on events other than his discharge, arguing that because Nomani filed his charge on February 14, 2013, "any Title VII discrimination allegations concerning events that pre-date April 21, 2012 (9 days prior to Nomani's discharge on April 30, 2012) are untimely and must be dismissed." (Doc. 21 at 26.) Star likewise asserts that any of Nomani's § 1981 claims based on events occurring before November 19, 2009 (approximately three months before his transfer to Store No. 4) are untimely. (Doc. 21 at 26–27.) Nomani does not respond directly to these arguments, but appears to concede these points by focusing his reply argument on the termination decision. (*See* Doc. 25.)

13 / 25

The law is clear that a Title VII plaintiff must file a charge with the EEOC within 300 days of the alleged discriminatory action. 42 U.S.C. § 2000e-5(e)(1). Failure to do so results in forfeiture of a plaintiff's claims. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 109. Accordingly, Nomani's Title VII claims based on events before April 21, 2012 are barred. Because the only event that falls within the statutory period is Nomani's discharge, it is the only Title VII claim that the Court will consider.

The statute of limitations for § 1981 employment discrimination claims based on termination is four years. *See Jones*, 541 U.S. at 382–83 (concluding that causes of action are governed by § 1658's four-year statute of limitations if the plaintiff's claim was made possible by a post-1990 enactment of the Civil Rights Act, such as claims relating to the termination of contracts). Because Nomani filed his lawsuit on November 19, 2013, § 1981 claims relating to employment actions that occurred prior to November 19, 2009, are also untimely and must be dismissed. The only discrimination allegations occurring after this deadline are the incident with Ms. Dong and the termination decision. However, for reasons explained in further detail in the next section, the termination decision is the only § 1981 claim the Court will address.

### ii.   Adverse Employment Actions

Star argues that all of Nomani's claims except for his discriminatory discharge claim also fail because none rise to the level of an actionable employment decision. (Doc. 21 at 27.) Again, the Court agrees. "[A]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy*, 492 F.3d at 559 (internal citation and quotation marks omitted). Thus, Nomani's only timely allegation of discrimination besides the termination under § 1981, the incident with Dong, is not actionable under the statute. The Court also notes that even were Nomani's other discrimination claims not

untimely, they would still be barred because only the termination rises to the level of an "adverse employment action."

### iii.    Plaintiff's Prima Facie Case for Discriminatory Discharge

In this case, the parties only dispute whether Nomani has met the fourth element of his prima facie case of discrimination. (Docs. 25 at 17–18; 21 at 28–30.) Star first argues that because Nomani was not replaced by a particular person he cannot raise a genuine issue of material fact that he was replaced by someone outside his protected class. (Doc. 21 at 28–29.) Second, focusing on the details of the final event leading to Nomani's termination, Star argues Nomani cannot raise a genuine issue of material fact that similarly situated employees outside of his protected class were treated differently under comparable circumstances because he "cannot identify a single similarly[ ]situated non-Muslim, non-Pakistani, non-Asian, and non-brown employee, who, after receiving a final written warning for improper pricing directly from Ward, continued to violate Star's sales practices, gave another customer an unauthorized discount, [and] gave that customer a different version of the paperwork than saved in Star's system, yet was not terminated." (Doc. 21 at 28–29.) In fact, Star urges, Nomani was treated identically to those outside his protected class because the company has fired other sales consultants who were not Muslim, Pakistani, Asian, or brown for giving customers unauthorized discounts. (*Id.* at 29–30.)

Nomani concedes that there is no evidence that he was replaced by any particular person. (Doc. 25 at 18.) However, citing Fifth Circuit precedent, he points out that "when the employer does not replace the plaintiff, the fourth element merely requires the plaintiff to show that others who are not in the protected class remain in similar positions." (*Id.*) (quoting *Bauer*, 169 F.3d at 966) (internal quotation marks omitted). Because the record indicates that numerous sales consultants outside the protected classes remained in their positions after his termination and

these individuals absorbed his work,[12] Nomani argues that he has established his prima facie case. (*Id.* at 19.)

First, the Court notes that Nomani is correct that in cases in which employees are discharged with no plan to replace them, a plaintiff may satisfy the fourth element of the prima facie case by demonstrating that others who were not members of the protected class remained in similar positions after the discharge. *Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir. 1990) (citations omitted); *Smith v. Hous. Indep. Sch. Dist.*, 4:12-CV-3083, 2014 WL 4471386, at *4 (S.D. Tex. Sept. 9, 2014) (citations omitted). *See also Dean v. Prop. One Inc.*, 51 Fed. App'x 929, *3 (5th Cir. 2002) (per curiam) (unpublished) ("Because Dean . . . offers no evidence that men remained in positions similar to hers after her discharge, she fails to establish a prima facie case of gender discrimination."). Second, the plaintiff's burden of establishing a prima facie case is not onerous. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The Fifth Circuit has made it clear that "a plaintiff need only make a very minimal showing." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985)) (internal quotation marks omitted). Here, Nomani produced at least some evidence that individuals not in his protected class(es) remained in their positions after his termination.[13] In light of the "very minimal showing" required, this is sufficient to

---

[12] Nomani specifically points to (1) Heba Hassan, a Middle-Eastern sales associate from Egypt; (2) Jerry O'Larry, a Caucasian, non-Muslim, non-Pakistani sales associate; (3) Dana Hasty, a Caucasian, non-Muslim, non-Pakistani sales associate; (4) Lance Samuell, an African, Black, non-Muslim sales associate from Jamaica; (5) Regan Estes, an African, Black, non-Muslim; and (6) Angela Watson, a Caucasian, non-Pakistani, non-Muslim. (Doc. 25 at 19.)

[13] The Court notes that although Nomani's reply confidently states the race, color, national origin, and religion for most of these individuals, the portions of the record cited in support of these claims indicate that Nomani in fact conceded he did not know what groups every sales associate fit into for each of these categories. (*See* Doc. 24-1 at p. 40, lines 11–12, p. 51, lines 23–24, p. 63, lines, 5–16, p. 67, lines 10–14.) Moreover, for at least one of the cited individuals (Watson), the portion of the record Nomani points the Court to does not support any of Nomani's

satisfy the contested element of the prima facie case. *Id.* (citation omitted). Accordingly, we now proceed to the next step of the *McDonnell Douglas* framework.

### iv.    Nondiscriminatory Reasons for Discharge

Once a prima facie case is raised, the burden shifts to Star "to articulate some legitimate, nondiscriminatory reason" for Nomani's discharge. *Reeves*, 530 U.S. at 142 (citation omitted). This is a burden of production, not persuasion, and it involves no credibility assessments. *Id.* (citation omitted). "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254 (citation omitted).

Here, Star has satisfied its burden by producing evidence that it fired Nomani for repeatedly violating Star's employment policies. *See Castlino v. Thomas*, 141 Fed. App'x 255, 257 (5th Cir. 2005) (per curiam) (unpublished) (recognizing that violating employer's policies and procedures is a legitimate, nondiscriminatory reason for termination); *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 325 (5th Cir. 2002) (citation omitted) ("Poor work performance is a legitimate, non-discriminatory reason for discharge."). There is ample evidence in the record to support Star's claim—including a number of disciplinary notices that specifically list what company policies Nomani violated over the course of several years, as well as several non-formal references to his poor performance, including messages between managers and references to uncited behavior within the disciplinary notices he did receive. (*See* Docs. 21-9 at 21; 24-1 at 524–30, 532–36.)

---

claims about what groups she belonged to, and the portion of Ward's testimony cited to support Nomani's claims that another of these individuals (Hassan) was Egyptian indicates that he was not entirely sure where she was from. Nevertheless, taking the facts in the light most favorable to Nomani and in light of the minimal showing necessary to establish a prima facie case, the Court concludes that because a number of these individuals appear to belong to at least one non-protected group and remained employed after his termination, Nomani has satisfied his burden with the evidence presented.

The Court concludes that this evidence is sufficient, "if believed by the trier of fact, to support a finding that unlawful discrimination was not the cause of the employment action." *Bauer*, 169 F.3d at 967 (internal citations and quotation marks omitted). Accordingly, the burden shifts back to Nomani to offer sufficient evidence to create a genuine issue of material fact that either Star's reason is not true, but is instead a pretext for discrimination, or that Star's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" was any of Nomani's protected characteristics. *See Rachid*, 376 F.3d at 312 (citation omitted).

### i.   Pretext and Motivating Factor

"Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient." *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001) (quoting *Bauer*, 169 F.3d at 967) (internal quotation marks omitted). In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus. *Rachid*, 376 F.3d at 312. The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated against him on the basis of the plaintiff's membership in the protected class. *Reeves*, 530 U.S. at 143.

Nomani offers two reasons that he believes demonstrate Star's proffered reason is pretext, or alternatively, that his race, color, national origin, and religion were a motivating factor in Star's decision to terminate him. First, he insists that he is innocent of the policy violations attributed to him, and second, he maintains that a number of remarks made by Taylor and Barnum indicate that Star was motivated by discriminatory animus. (Doc. 25 at 20–26.)

Star disagrees. In response to Nomani's first argument, the company contends there is no

evidence that Ward, the decision maker in Nomani's termination, was motivated by anything besides his reasonable belief that Nomani was guilty of the policy violations contained in his employment record—a decision bolstered by the fact that Ward was the individual who hired Nomani in the first place and multiple levels of management concurred in the firing decision. (Docs. 21 at 30–32; 26 at 3–7, 11.) To Nomani's second argument, the company responds that the alleged comments are irrelevant because they were made by non-decision makers years before the termination decision. (Docs. 21 at 31–32; 26 at 8–10.)

### 1. Actual innocence

Nomani first argues that Star's proferred reason is pretext because "[t]he accusations lodged against [him] . . . have either proven to be completely fabricated and false, or of such miniscule scale that they are not credible reasons for firing a top producing Sales Associate employed with Defendant for over seven (7) years, who year-after-year exceeded $1,000,000 in annual sales." (Doc. 25 at 20.) His protestations fall on deaf ears. "[A] fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith." *Cervantez v. KMGP Services Co. Inc.*, 349 Fed. App'x 4, 10 (5th Cir. 2009) (per curiam) (unpublished) (citing *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir. 1993)).

In this case, the Star employee handbook makes it clear that "violations that may result in discharge" include "selling merchandise or services to a customer for anything other than the current, authorized selling price." (Doc. 24-1 at 427.) Consequently, whether Nomani is in fact guilty of such allegations is irrelevant as long as Ward believed in good faith that he was. Moreover, because "nothing prohibits an employer from considering previous discipline or bad behavior in making termination decisions"—guilty or not—Star was also free to consider the

number and frequency of Nomani's alleged violations in making its termination decision. *Kelly v. Costco Wholesale Corp.*, 632 Fed. App'x 779, 784 (2015).

"Title VII does not protect against unfair business decisions, only against decisions motivated by unlawful animus." *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997) (internal citation and quotation marks omitted). As a result, the Fifth Circuit has repeatedly stated that, "an employee's subjective belief of discrimination alone is not sufficient to warrant judicial relief." *Auguster*, 249 F.3d at 403 (internal citation and quotation marks omitted). Likewise, merely disputing the underlying facts of an employer's decision is insufficient to show pretext. *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007).

Here, Nomani offers nothing besides his subjective belief and conclusory assertions that the repeated policy violations that led to his termination were the result of misunderstandings and confusion. (*See* Doc. 25 at 20–23.) He presents no evidence to suggest that Ward's decision to terminate him was made in bad faith or on the basis of anything besides the number of repeated policy violations documented in his employment record. (*See id.*) This is insufficient to defeat summary judgment. *See, e.g.*, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citation omitted) (noting that conclusory assertions are insufficient to defeat summary judgment); *Kennerson v. Guidry*, 135 Fed. App'x 639, 641 (5th Cir. 2005) (per curiam) (unpublished) (citation omitted) (noting that subjective belief is insufficient to defeat summary judgment). Instead, Nomani "must offer specific evidence refuting the factual allegations underlying the proffered reasons for his termination." *Condon v. Wood Grp. Logging Servs., Inc.*, H-06-2193, 2007 U.S. Dist. LEXIS 59556, *21 (S.D. Tex. Aug. 14, 2007). He failed to do so.

The Court's conclusion that Ward's decision was made in good faith on the basis of "poor performance and improper conduct" is only bolstered by the fact that multiple levels of

management concurred in the firing decision. *See Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 806 n.2 (5th Cir. 2007) (noting that collective firing decision is less susceptible to conclusion that it was influenced by questionable motives).  Regardless of whether Nomani feels that Star's decision to fire him was unfair, "fairness and correctness do not bear on pretext." *Kelly*, 2015 WL 8527340, at *4. Anti-discrimination laws were simply not intended to permit the courts to re-examine employment decisions. *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir. 1988). As we have already said, the laws "do not require an employer to make proper decisions, only non-[discriminatory] ones." *LeMaire*, 480 F.3d at 391. Given the volume of evidence indicating that Nomani willfully violated the same or similar policies and procedures in spite of repeated warnings not to do so, his assertions that he is innocent are insufficient to defeat summary judgment.

Moreover, given that Nomani was both hired and fired by Ward (Docs. 24-1 at p. 140, lines 15–24; 21-6 at p. 8, ¶¶ 22–23; 21-7 at p. 7, ¶ 16; 21-9 at p. 10, ¶¶ 23–24; 21-10 at p. 9, ¶ 23), Star is entitled to the "same-actor" inference. This doctrine reasons that "from the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996), *abrogated on other grounds by Reeves*, 530 U.S. at 134 (internal citation and quotation marks omitted). In order to rebut this inference, the plaintiff must present evidence of "sufficiently egregious" facts. *Id.* "One way to rebut the same-actor inference is . . . under the cat's paw theory of liability." *Rivera v. Wyndham Hotel Mgmt., Inc.*, CV H-15-632, 2016 WL 1090108, at *6 (S.D. Tex. Mar. 21, 2016) (quoting *Stubbs v. Regents of Univ. of Cal.*, No. CIV. S-06-1 KLL/DAD, 2007 WL 1532148, at *12 (E.D. Cal. May 25, 2007)) (internal citation marks omitted).

Under the cat's paw theory of liability, the plaintiff may impute the discriminatory attitudes of co-workers who had influence or leverage over the adverse employment decision to the official decision maker. *Id.* at \*6–7; *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) (citations omitted). In order to invoke this analysis, Nomani must submit evidence sufficient to demonstrate: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker "possessed leverage, or exerted influence, over the titular decision maker." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (citations omitted). In such cases, the decision maker is considered to have merely "rubber stamped" the recommendation of the employee with discriminatory animus. *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998). When the decision maker conducts his own investigation, however, the link between the animus-harboring employee and the decision maker may be severed—so long as the supervisor determines that the adverse action was, aside from the biased report, entirely justified. *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011). Because this analysis is functionally the same as the two-part test applied to stray remarks, the Court will address the applicability of these requirements to the two individuals Nomani alleges harbored discriminatory animus towards him—Barnum and Taylor—below.

### 2.   Barnum & Taylor's remarks

Nomani also argues that a number of remarks on the part of Taylor and Barnum indicate that Star's proffered reason is a pretext or demonstrate that his race, color, national origin, and religion were a motivating factor in Star's decision to terminate his employment. (Doc. 25 at 23–26.) Specifically, Nomani alleges that (1) Barnum threatened to call immigration and have him deported after Nomani made an error at work; (2) Barnum routinely threatened to call immigration on Nomani in front of other employees; (3) Barnum was "openly hostile" to

Nomani's religious practices; (4) Taylor and Barnum exchanged an email referring to Nomani that said: "[o]ne of these days mo will be no mo"; and (5) Taylor emailed Patrick stating "I love pointing out the free lunch to [Nomani] during Ramadan." (*Id.* at 23–24.) Star responds that the comments Nomani points to are simply "stray remarks" of no import to his discrimination claims because they are too remote in time to the termination and were made by individuals with no influence over the termination decision. (Docs. 21 at 31–32; 26 at 8–10.) According to Nomani, they are not "stray remarks" because Taylor influenced the employment decision and there is no evidence that Ward conducted an independent investigation of the allegations upon which Nomani's termination was based. (Doc. 25 at 26.)

Where a plaintiff offers remarks as circumstantial evidence alongside other allegedly discriminatory conduct courts apply a two-part test.[14] *See Russell*, 235 F.3d at 226. In that circumstance, a plaintiff need only show (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decision maker. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012) (citations omitted).

Nomani fails this test. To begin with, taken in context, the comments do not reveal

---

[14] In this case, Nomani admits that the remarks are not offered as the only evidence of pretext (Doc. 25 at 26), making the *Russell* test the appropriate stray-comment test to apply in this case. Where a plaintiff offers remarks as direct evidence instead, courts apply a four-part test to determine whether they are sufficient to overcome summary judgment. *CSC Logic*, 82 F.3d at 655 (holding that remarks may serve as sufficient evidence of discrimination if they are: 1) related to the protected class; 2) proximate in time to the termination; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.); *see also Laxton*, 333 F.3d at 583 n.4 (citation omitted) (noting that, in light of the Supreme Court's decision in *Reeves*, 530 U.S. 133, the *CSC Logic* test applies only when a remark is presented as direct evidence of discrimination). Even under the stricter *CSC Logic* test, however, the Court concludes that the alleged comments fail because they are not proximate in time to the termination, made by an individual with authority over the employment decision, or related to the decision to terminate Nomani.

discriminatory animus on the part of Taylor and Barnum. More importantly, however, Nomani fails the second part of the test with regard to both Taylor and Barnum. The record is clear that Barnum did not influence the termination decision. (Docs. 21-6 at p. 8, ¶¶ 22–23; 21-7 at p. 7, ¶ 16; 21-8 at p. 13, ¶ 33; 21-9 at p. 10, ¶¶ 23–24; 21-10 at p. 9, ¶ 23.) In fact, the record indicates that it was Patrick, not Taylor, who reported Nomani's June 2011 and April 2012 policy violations and recommended his termination. (Docs. 21-6 at pp. 6–8, ¶¶ 16, 20, 22; 21-7 at pp. 6–7, ¶¶ 14–16; 21-9 at p. 10, ¶ 23; 21-10 at pp. 7, 9, ¶¶ 14–15, 21–23.)

Furthermore, contrary to Nomani's assertion that there was no independent investigation to sever the connection between Taylor and Ward, the record does in fact indicate that after learning about Nomani's violations from Taylor, Patrick undertook an independent investigation each time before reporting to Ward. (Doc. 21-10 at p. 10, ¶ 24.) The record also indicates that Ward was aware of Nomani's repeated violations of Star policies from others besides Taylor— and issued the final warning to Nomani himself—months before Nomani alleges that Taylor recommended Nomani's termination. (*See* Doc. 21-6 at pp. 6–8, ¶¶ 16, 20–23; 21-7 at p. 6–7, ¶¶ 14, 16; 21-9 at p. 6–7, ¶ 14–16; 21-10 at p. 7, ¶¶ 15–16.) Thus, were it even possible to conclude that Taylor harbored discriminatory animus, given Nomani's employment record, Star would not be liable because the outcome would have still been "an adverse action[, but] for reasons unrelated to the supervisor's original biased action . . . ." *Staub*, 562 U.S. at 421. As a result, Nomani has failed to meet his evidentiary burden on the issue of pretext or mixed motive and his discrimination claims must be dismissed.

**B. Plaintiff's Remaining Claims**

Counts Three, Four, and Five of Nomani's Complaint assert claims for racial harassment under 42 U.S.C. § 1981; retaliation under § 21.055 of the Texas Labor Code and § 704 of Title

VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e-3(a); and common law negligence. (Doc. 9 at ¶¶ 64–63.) In its motion, Star also moved for summary judgment on these claims. (Doc. 21 at 33–45.) However, in his response to Star's motion, Nomani advised the Court that he wished to "pursue only his discrimination claims based on race, color, national origin and religion under Title VII and Section 1981." (Doc. 25 at 8.) Therefore, he produced no summary judgment evidence in support of these original claims. (*See id.*) Accordingly, Star's Motion for Summary Judgment is GRANTED on these claims and they are DISMISSED with prejudice.

### IV. Conclusion

Nomani has failed to produce sufficient evidence to create a genuine issue of material fact as to whether Star's stated reason for terminating Nomani was a pretext for, or motivating factor in, his termination. Accordingly, it is hereby

**ORDERED** that Star's Motion for Summary Judgment (Doc. 21) is **GRANTED**. Nomani's complaint is **DISMISSED** with prejudice.

SIGNED at Houston, Texas, this 8th day of August, 2016.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE